**ZIMMERMAN REED LLP**
Caleb Marker (SBN 269721)
  caleb.marker@zimmreed.com
Flinn T. Milligan (SBN 323042)
  flinn.milligan@zimmreed.com
6420 Wilshire Blvd., Suite 1080
Los Angeles, CA 90048
Tel (877) 500-8780; Fax (877) 500-8781

**ZIMMERMAN REED LLP**
Ryan J. Ellersick (*Pro Hac Vice* anticipated)
  ryan.ellersick@zimmreed.com
14648 North Scottsdale Road, Suite 130
Scottsdale, AZ 85254
Telephone: (480) 348-6400

*Attorneys for Plaintiff and the Putative Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.H., individually, and on behalf of those similarly situated,<br><br>                     Plaintiff,<br><br>          v.<br><br>DONE GLOBAL, INC.,<br><br>                     Defendant. | Case No.: 3:24-cv-03040<br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff M.H. ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys of record, assert the following against Done Global, Inc. ("Done" or "Defendant").

## INTRODUCTION

1.      This class action arises out of Done's unlawful use of third-party tracking technologies (the "Tracking Tools") to surreptitiously intercept and disclose its patients' private and protected communications, including communications concerning highly sensitive personal health information, to third parties, without patients' knowledge or consent. By purposely embedding and deploying the Tracking Tools on Done's website, https://www.donefirst.com, Done engages in the unauthorized

CLASS ACTION COMPLAINT

disclosure of its patients' highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Personal Information") to third parties, including, but not limited to, Meta Platforms, Inc. d/b/a/ Meta, TikTok, Snapchat, and Google. Such disclosures of Personal Information violate state and federal law.

2.      Done is a telehealth and technology company that provides mental health and prescription treatment options for individuals with Attention Deficit Hyperactivity Disorder ("ADHD"). According to its website, "Done. is dedicated to serving individuals who otherwise may not be comfortable seeking care for ADHD in person due to stigma around ADHD treatment or may not be able to access care due to cost or availability." In connection with seeking ADHD-related treatment, Done's website allows patients to research topics related to ADHD treatment options, testing, symptoms, diagnosis, medications, and doctors. The website also allows patients to take an initial health assessment and ultimately schedule appointments with healthcare providers. Unbeknownst to its patients and prospective patients, these communications with the Done website are intercepted and disclosed to third parties through Done's use of the Tracking Tools.

3.      One of the Tracking Tools Done deployed on its website is the Meta Pixel ("Pixel").[1] Pixel is a snippet of code that, when embedded on a website, tracks the website visitor's activity on that website and sends that data to Meta. This includes tracking and logging pages and subpages the website user visits during a website session that reveal patient status and other personal identifying and protected health information, which is not anonymized. Indeed, Pixel is routinely used to target specific individuals by utilizing the data gathered through Pixel to build profiles for the purpose of future targeting and marketing. Here, the information transmitted to third-party Meta without Plaintiff's consent included private health information,[2] which is some of the most personal and sensitive data a person has.

---

[1] Meta also provides other tracking technologies that give the same or similar tracking functionalities as Pixel, including, but not limited to, Conversions API, SDKs, and Audiences.

[2] Under HIPAA, "health information" is defined as "any information[], whether oral or recorded in any form or medium, that . . . [i]s created or received by a health care provider . . . and [r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Additionally, HIPAA defines "health care" as "care, services, or supplies related

CLASS ACTION COMPLAINT

4.      Additionally, when a patient communicates with Done's Website where Pixel is present, Pixel source code causes the exact content of the patients' communications with the Website to be re-directed to Meta in a way that identifies the person as a patient. Here, for example, Plaintiff used the Website to communicate about his ADHD symptoms and to research potential treatments and medications. Unbeknownst to Plaintiff, when he communicated about his personal health information, Pixel secretly intercepted, recorded, and transmitted those private communications to Meta along with unique identifiers Meta could use to identify Plaintiff.  Specifically, Done used Pixel to intercept its users' communications and have those communications associated with Facebook and Instagram user profiles for purposes of future ad targeting and marketing.

5.      As a result of Defendant's use of Pixel, Plaintiff's and Class Members' Personal Information, including, but not limited to, computer IP addresses; patient status; health conditions; health symptoms; treatments; health assessments; and unique identifiers used to link the web communications to Plaintiff and the Class, was compromised and disclosed to third parties without authorization or consent.

6.      Such private information would allow Meta to know that a specific patient was seeking confidential health care from Done or exploring treatment for a specific condition, ADHD.

7.      Defendant's Tracking Tools have also transmitted patients' Sensitive Information to additional unauthorized third parties for marketing and advertising purposes, including TikTok, Snapchat, and Google, among others.

8.      Plaintiff and the Class Members never consented to, authorized, or otherwise agreed to allow Defendant to disclose their Personal Information to anyone other than those reasonably believed to be part of Done, acting in some healthcare-related capacity. Despite this, Defendant knowingly and intentionally disclosed Plaintiff's and the Class Members' Personal Information to multiple third-party technology companies for ad retargeting and otherwise monetizing Plaintiff's data.

9.      As a direct and proximate result of Defendant's unauthorized exposure of Plaintiff's and the Class Members' Sensitive Information, Plaintiff and the Class Members have suffered injury,

---

to the health of an individual" and includes, but is not limited to, the "[s]ale or dispensing of drug, device, equipment, or other item in accordance with a prescription." *Id.*

CLASS ACTION COMPLAINT

including an invasion of privacy; loss of the benefit of the bargain Plaintiff and the Class Members considered at the time they bargained for healthcare services and agreed to use Defendant's Website for services; statutory damages; and the continued and ongoing risk to their Private Information.

10.     Accordingly, Plaintiff brings this action individually, and on behalf of Classes of similarly situated individuals, to recover for harms suffered and asserts the following claims: (I) Violation of the California Invasion of Privacy Act, Cal. Penal Code, § 630 et seq.;(II) Invasion of Privacy in Violation of Article I, Section 1 of the California Constitution; (III) Common Law Invasion of Privacy – Intrusion Upon Seclusion; (IV) Breach of Confidence; and (V) Violation of the California Unfair Competition Law Cal. Bus. & Prof. Code § 17200 et seq. – Unlawful Business Practices.

## PARTIES

15.     **Plaintiff M.H.** is a natural person who resides and intends to remain in California. At all relevant times, M.H. was a citizen of California. Within the last year, and most recently in or about January 2024, M.H. visited Done's Website from California using his cell phone to research treatments, medications, and physicians related to his ADHD symptoms.  M.H. also used the Website to take Done's initial mental health assessment.  At all relevant times, M.H. maintained accounts and stayed logged in to Facebook, Instagram, and Snapchat.  After visiting Done's Website and communicating about private mental health treatment for himself, M.H. received ads from Done on Facebook.

16.     Plaintiff did not consent to disclosure of his Personal Information to Meta, TikTok, Snapchat, Google, and other third parties.

17.     Plaintiff reasonably expected that his online communications with Defendant were between him and Defendant and that such communications would not be shared with third parties without his consent.

18.     **Defendant Done Global, Inc.,** is a Delaware corporation with its principal place of business in San Francisco, California.  According to the Terms and Conditions on Done's Website, "Done Global, Inc. operates technology services, the website donefirst.com, associated mobile applications, and the content associated therewith (the "Service"), which facilitate the delivery of healthcare services through telehealth technology to patients of third-party medical groups."  The contact address listed on the Done Website is 548 Market St., PMB 99481, San Francisco, CA 94104.

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

20.     This Court has personal over Defendant because Done purposely availed itself of the benefits of the forum and because a substantial portion of the events giving rise to this complaint occurred in this District.

21.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) – (2) because Defendant's principal place of business is in this District and because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

**FACTUAL ALLEGATIONS**

**A.     Federal Regulators Have Warned Healthcare Providers About the Use of Tracking Technologies**

22.     The surreptitious collection and disclosure of Sensitive Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights of the U.S. Department of Health and Human Services ("HHS") have recently reiterated the necessity for data security and privacy concerning health information.

23.     For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. Rather, it is anything that conveys information—or enables an inference—about a consumer's health. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[3]

---

[3] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023), https://www.ftc.gov/business-

24.     The FTC is unequivocal in its stance as it informs—in no uncertain terms—companies that provide healthcare services that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.** In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out. [Recent FTC enforcement actions such as] *BetterHelp, GoodRx, Premom,* and *Flo* make clear that practices like that may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[4]

25.     In December 2022, HHS similarly warned healthcare providers that, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[5]  The OCR's guidance also made clear that, "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[6]

26.     In July 2023, the FTC and HHS sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Sensitive Information to third parties.[7]  The letter highlighted the "risks and concerns about the use

---

guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases   (last visited May 14, 2024).

[4] *Id.* (emphasis added).

[5] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, (March 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. The original guidance was issued in December 2022 and was recently updated in March 2024.

[6] *Id.*

[7] See Leslie Fair, *FTC-HHS joint letter gets to the heart of the risks tracking technologies pose to personal health information*, FTC Business Blog (July 20, 2023) https://www.ftc.gov/business-

of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[8] According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[9]

27.     In February 2024, the FTC took enforcement action against one of Done's competitors, Cerebral Inc., for, among other things, providing "sensitive information of nearly 3.2 million consumers to third parties such as LinkedIn, Snapchat and TikTok by using or integrating tracking tools on its website or apps."[10]

28.     Despite these clear warnings from federal regulators and prior enforcement actions, Done embedded Tracking Tools on its Website to secretly track its patients' communications regarding healthcare information and disclose those communications to third parties.

**B.     Done's Misleading Website Disclosures**

29.     Done makes several material misrepresentations and omissions on its website concerning its use of the Tracking Tools and disclosure of patients' private health information.

30.     For example, first-time visitors to Done's website are presented with a pop-up banner that reads, "By clicking 'Accept All Cookies,' you agree to the storing of cookies on your device to enhance site navigation, analyze site usage, and assist in our marketing efforts." Nothing on the pop-up banner mentions the disclosure of a patient's substantive health information and unique identifiers to third-party technology companies.

---

guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information (last visited May 14, 2024).

[8] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

[9] *Id.*

[10] *Proposed FTC Order will Prohibit Telehealth Firm Cerebral from Using or Disclosing Sensitive Data for Advertising Purposes, and Require it to Pay $7 Million*, https://www.ftc.gov/news-events/news/press-releases/2024/04/proposed-ftc-order-will-prohibit-telehealth-firm-cerebral-using-or-disclosing-sensitive-data (last visited May 14, 2024)

31.     Within the pop-up banner, users then have the option to click "Cookies Settings," "Reject All," "Accept All Cookies," or simply click "X" to remove the pop-up banner and continue navigating the Website without making any selection at all.  Even if a user clicks "Reject All," the Tracking Tools continue to operate behind the scenes, intercepting the patient's substantive health communications through Done's website.

32.     Done's "Notice of HIPAA Privacy Practices" also gives a false assurance concerning Done's handling of personal health information, stating, "Without your authorization, we are expressly prohibited from using or disclosing your [private health information] for marketing purposes."

33.     Despite these representations, Done deploys Tracking Tools from multiple third-party technology companies that disclose (1) a user's specific health condition, ADHD, and (2) the user's unique identifiers used to link the web communications on the Done Website with a specific individual and account holder for purposes of ad retargeting.

**C.     The Meta Pixel**

34.     Through its Website, Done connects Plaintiff and the Class Members to Defendant's digital health care platform with a core goal of increasing profitability.

35.     In furtherance of that goal, and to increase the success of its advertising and marketing, Defendant purposely embedded and deployed Meta Pixel on its Website. By doing so, Defendant surreptitiously shared its patients' and prospective patients' identities and online activity, including private communications related to conditions, symptoms, treatments, and medications, with Meta.

36.     Meta's core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram. The bulk of Meta's billions of dollars in annual revenue comes from advertising—a practice in which Meta actively participates by using algorithms that approve and deny ads based on the ads' content, human moderators that further review ads for both legality and aesthetics prior to and after the ads are published, and other algorithms that connect ads to specific users, without the assistance or input of the advertiser.

37.     Over the last decade, Facebook, now Meta, has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Facebook's daily, monthly, and annual user base has grown exponentially to billions of users.

38.     Meta's advertising business has been successful due, in significant part, to Meta's ability to target users, both based on information users provide to Meta, and based on other information about users Meta extracts from the Internet at large. Given the highly specific data used to target particular users, thousands of companies and individuals utilize Facebook's advertising services.

39.     One of Meta's most powerful advertising tools is the "Meta Pixel" (formerly the "Facebook Pixel"), which it first launched in 2015.

40.     Meta branded Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." Meta further stated:

> Facebook pixel, [is] a new way to report and optimize for conversions, build audiences[,] and get rich insights about how people use your website. We're also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.
>
> Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels and Custom Audience pixels into a single pixel. You only need to place a single pixel across your entire website to
>
> report and optimize for conversions. Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.
>
> [Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (*e.g.*, Purchase) to your Facebook pixel base code on appropriate pages (*e.g.*, purchase confirmation page).[11]

41.     Pixel is an easily attainable piece of code that Meta makes available to website developers for free. In exchange, at a minimum, website developers must agree to Meta's Business Tool Terms.[12]

42.     The Business Tool Terms note that the Meta's Business Tools, including Pixel, will capture two types of information: "Contact Information" which "personally identifies individuals," and

---

[11] Cecile Ho, *Announcing Facebook Pixel*, Meta (Oct. 14, 2015), https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited May 14, 2024).

[12] Meta Business Tool Terms, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0S Tn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr ("When you use any of the Meta Business Tools . . . or otherwise enable the collection of Business Tool Data . . . these Business Tool Terms govern the use of that data.") (last visited May 14, 2024).

"Event Data" which contains additional information about people and their use of a developer's website.[13]

43.     The Business Tools Terms also require websites to "provide[] robust and sufficiently prominent notice to users . . . on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Meta, may . . . collect or receive information from your websites and elsewhere on the Internet and use that information to . . . deliver ads, (b) how users can opt out of the collection and use of information . . . and (c) where a user can access a mechanism for exercising such choice[.]"[14]

44.     However, even with all of these protocols in place, Meta prohibits the disclosure of Business Tool Data "that you know or reasonably should know . . . includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[15]

45.     After agreeing to the Business Tools Terms, website developers can choose to install and use Pixel on their websites to track and measure certain actions, such as a website visitor's text searches and page views, including the detailed URLs triggered by page views. When a website visitor takes an action a developer chooses to track on its website, Pixel is triggered and sends data about that "Event" to Meta. All of this happens without the user's knowledge or consent.

46.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smart phone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

47.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

---

[13] *Id.* at Section 1(a)(i)-(ii)

[14] *Id.* at Section 3(c)(i)

[15] *Id.* at Section 1(h).

48.     Ultimately, a browsing session online may consist of thousands of web communications. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- An **HTTP Request** is an electronic communication a website visitor sends from his device's browser to the website's server. There are two types of HTTP Requests: (1) GET Requests, which are one of the most common types of HTTP Requests—in addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies; and (2) POST Requests which can send a large amount of data outside of the URL. In this case, a patient's HTTP Request would be asking Defendant's Website to get certain information, such as a list of clinic locations or prescriptions. So that servers can better understand what information users are requesting, HTTP Requests also use URLs that contain parameters, which use variables and assigned values in the URL to pass additional information through the HTTP Request.

- **Cookies** are a text file that website operators and others use to store information on the website visitor's device; these can later be communicated to a server or servers. Cookies are sent with HTTP Requests from website visitor's devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website. Third-party cookies are created by a website with a domain name other than the one the user is visiting, in this case Meta. There are also "first-party cookies," like the fbp cookie, which is created by the website the user is visiting, in this case Defendant. Meta uses both first- and third-party cookies in Pixel to link Facebook IDs and Facebook profiles, and Defendant sends these identifiers to Meta.

- An **HTTP Response** is a response to an HTTP Request. It is an electronic communication that is sent as a reply to the website visitor's device's web browser from the host server. HTTP responses may consist of a web page, another kind of file, text

11

information, or error codes, among other data. Basically, the HTTP Response is when the website sends the requested information (*see* the HTTP Request); this is sometimes called the "Markup."

49.     A user's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as "Orthopedics"). The HTTP Response then renders or loads the requested information in the form of Markup (i.e., the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website).

50.     Every website, including Defendant's, is composed of Markup and "Source Code." Source code is a set of instructions that commands the website visitor's browser to take certain actions when the web page loads or when a specified event triggers the code.

51.     Source code may also command a web browser to transmit data to third parties in the form of an HTTP Request. Such data transmissions allow a website to export data about users and their actions to third parties. Third parties receiving this data are typically configured to track user data and communications for marketing purposes.

52.     Transmission of a such data can be done quietly in the background without notifying the web browser's user. The pixels are invisible to website users and thus, without any knowledge, authorization, or action by the user, the website site developer (or website commander) can use its source code to contemporaneously and to invisibly re-direct the user's PII and other non-public medical information to third parties. Through Pixel, Defendant uses source code that can accomplish just that.

53.     Pixel "tracks the people and the types of actions they take."[16] According to Meta, Pixel is a piece of code that allows Defendant to measure the effectiveness of [its] advertising by understanding the actions [website visitors] take on [its] website."[17] Thus, by secretly recording and transmitting data to Meta—without the user's knowledge or consent—Pixel acts much like a traditional wiretap controlled by Done.

---

[16] *Retargeting*, Facebook, https://www.facebook.com/business/goals/retargeting (last visited May 14, 2024).

[17] *About Meta Pixel*, Meta Business Help Center, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited May 14, 2024).

54.     Through this online tracking technology, Meta intercepts each page a user visits, what buttons they click, as well as the specific information the user inputs into the website and other searches conducted. Pixel sends each of these pieces of information to Meta with PII, such as the user's IP address. Meta stores this data on its own servers, in some instances for years on end, and independently uses the data for its own financial gain.

55.     Importantly, this data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's website, Meta receives third-party cookies allowing Meta to link the data collected by Pixel to the specific Facebook user. In other words, a user's personal and private information sent by the Meta Pixel to Facebook is sent alongside that user's personal identifiers, including IP address and cookie values, which can be linked to the user's unique Facebook account.

56.     Meta accomplishes this by placing cookies in the web browsers of users logged into their services, which aids Meta in identifying users.

57.     One such example is the "c_user" cookie, which is a type of third-party cookie assigned to each person who has a Facebook account. The "c_user" cookie contains a numerical value known as the Facebook ID ("FID") that uniquely identifies a Facebook user. It is composed of a unique and persistent set of numbers. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly, and easily, locate, access, and view the user's corresponding Facebook profile. Thus, when a Facebook user visits Defendant's Website while logged in to their Facebook account, Pixel transmits the user's private web communications with the Defendant along with the "c_user" cookie.  Meta can then use this information to match the web communications with the user's Facebook ID.

58.     Even if a user does not have a Facebook account or is not logged in to Facebook when browsing the Defendant's Website, Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie.

CLASS ACTION COMPLAINT

Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID. And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via Pixel and "_fbp" cookie to the newly created account.

59.     Meta's Business Tools Terms make clear that Pixel is meant to "match the Contact Information" of users "against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[18]

60.     After Meta is finished processing users' intercepted information, it makes the relevant analytics available to Done through Meta's Event Manager tool.

61.     Using the Events Manager, Done can and is intended to review a summary of users' activity, including the pages, parameters and URLs sent through Pixel,[19] as well as any included metadata.[20]

62.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Meta.  Meta then uses the information transmitted by Pixel to match the user with their Facebook ID.

63.     Judge William H. Orrick on the U.S. District Court for the Northern District of California summarized how this process plays out:

> To understand how the Meta Pixel typically works, imagine the following scenario. A shoe company wishes to gather certain information on customers and potential customers

---

[18] Meta Business Tool Terms, Section 2(a)(i)(1), https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0S Tn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr (last visited May 14, 2024).

[19] *How to view pages, parameters and URLs in Meta Events Manager*, https://www.facebook.com/business/help/815029860145251 ("In Meta Events Manager, you can see a summary of pages, parameters and URLs recently sent through the Meta Pixel . . . .") (last visited May 14, 2024).

[20] A web developer using the Events Manager can "[c]lick on the filter icon to select what activity types and details are display." Developers can sort by activity types, including "automatically logged pixel events," which may contain metadata. *Test your app or web browser events using the test events tool*, https://www.facebook.com/business/help/2040882565969969?id=1205376682832142 (last visited May 14, 2024).

who visit its website. The shoe company first agrees to Meta's Business Tools Terms (discussed below), which govern the use of data from the Pixel. The shoe company then customizes the Meta Pixel to track, say, every time a site visitor clicks on the "sale" button on its website, which is called an "Event." Every time a user accesses the website and clicks on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which then sends certain data to Meta. Meta will attempt to match the customer data that it receives to Meta users—Meta cannot match non-Meta users. The shoe company may then choose to create "Custom Audiences" (i.e., all of the customers and potential customers who clicked on the "sale" button) who will receive targeted ads on Facebook, Instagram, and publishers within Meta's Audience Network. Meta may also provide the shoe company with de-identified, aggregated information so the shoe company understands the impact of its ads by measuring what happens when people see them. Meta does not reveal the identity of the matched Meta users to the shoe company.

*In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2 (N.D. Cal. Dec. 22, 2022) (internal citations omitted).[21]

64.     Pixel also allows a company, like Defendant, to impact the delivery of ads, measure cross-device conversions, create custom audiences, and save money on advertising and marketing costs.[22] But, most relevant here, Pixel allowed Defendant and Meta to track website users secretly on Defendant's Website and intercept their communications with Defendant.

65.     When visitors to Done's Website, like Plaintiff and the Class Members, communicated with Defendant or inquired about personal health-related topics, that information was transmitted to and intercepted by Meta.

66.     The Sensitive Information intercepted, recorded, and transmitted to Meta includes, but is not limited to, patient status; health symptoms; health conditions; treatments; and medications. During that same transmission, Defendant would also provide Meta with the patient's Facebook ID number, other persistent cookies, device ID, computer IP addresses, or other PII. This information makes it easy to link private communications with Defendant via the Website to a specific and identifiable Facebook user.

---

[21] In describing Pixel technology in *In re Meta Pixel Healthcare Litig.*, the court referenced the declaration of expert Richard M. Smith, which provides further details on the manner in which the challenged Pixel technology works and Meta's arrangements with health providers that employ it. 2022 WL 17869218, at *2. *See* Declaration of Richard M. Smith, filed in *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].

[22] *Meta Pixel,* Facebook, https://www.facebook.com/business/tools/meta-pixel?ref=search_new_2 (last visited May 14, 2024).

67.     Once Meta has that data, it can process it, analyze it, and assimilate it into databases like Core Audiences or Custom Audiences for advertising purposes. If the website visitor is also a Facebook user, Meta will associate the information that it collects from the visitor with a Facebook ID that identifies the user's name and Facebook profile. In sum, Pixel allows Meta to learn, manipulate, and use for financial gain, the medical and private content Defendant's Website visitors communicated, viewed, or otherwise interacted with on Defendant's Website.

**D.     Done's Use of other Tracking Tools**

68.     In addition to its deployment of the Meta Pixel, Done deploys Tracking Tools from multiple other third-party technology companies, including TikTok, Snapchat, and Google.   These Tracking Tools function in a substantially similar way as the Meta Pixel by intercepting the substance of a user's communications with the Done Website and transmitting those communications to third parties along with unique identifiers used to link the communications to a user's account.

*i.     The TikTok Pixel*

69.     The TikTok Pixel is a piece of code that companies can embed in their websites to transmit information to TikTok about user activities on the website.  Once the TikTok Pixel is installed on a website, the Pixel secretly operates in the background, invisible to visitors to the website, while it intercepts and records the user's communications with the website.

70.     By default, the TikTok Pixel collects the following information: the timing of when actions on the website take place (like when a page is viewed); the user's IP address; the device make, model, operating system, and browser information for the user; third-party cookies to match the user's website communications to an identified person on TikTok; pages viewed on the website; buttons clicked on the website; and content typed into "search" bars.  Beyond these standard collection efforts, a website owner can also customize the TikTok Pixel to collect additional information about a website visitor's activities and transmit that information to TikTok.

71.     TikTok uses cookies and other unique identifiers intercepted by the TikTok Pixel to match a website visitor's communications and activities with a particular individual.

72.     When an individual with a TikTok account visits a website that uses the TikTok Pixel, the Pixel intercepts the individual's communications and transmits them to TikTok along with unique

first and third-party cookies. TikTok can then "match[] [the] visitors on [the] website with people on TikTok."[23]

73.     Even when an individual does not have a TikTok account, when they visit a website that uses the TikTok Pixel, the Pixel intercepts the individual's communications and transmits the information to TikTok.[24]  On information and belief, TikTok can then match the communications to a particular individual through a process called "fingerprinting."[25]

74.     TikTok uses the information it collects through the TikTok Pixel to provide advertisers—like Done—with custom or lookalike audiences for purposes of targeted advertising campaigns.  TikTok can also sell the personal data it collects to data brokers and other third parties. Indeed, a recent analysis found that TikTok shared its users' data more than any other social media app, and it was unclear where the data went.[26]

### ii. The Snap Pixel

75.     Snapchat is another social media company that has over 750 million users, including approximately 150 million in the U.S.27  Like Meta and LinkedIn, Snapchat generates substantial revenue by selling advertising on its platform.  In 2022, Snapchat generated approximately $4.6 billion in revenue, with roughly 99 percent coming from advertising.[28]

---

[23] *Using Cookies with TikTok Pixel*, https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?redirected=2 (last visited May 14, 2024).

[24] Thomas Germaine, *How TikTok Tracks You Across the Web, Even If You Don't Use the App*, https://www.consumerreports.org/electronics-computers/privacy/tiktok-tracks-you-across-the-web-even-if-you-dont-use-app-a4383537813/ (last visited May 14, 2024).

[25] Matt Burgess, *The Quiet Way Advertisers Are Tracking Your Browsing*, https://www.wired.com/story/browser-fingerprinting-tracking-explained/ (last visited May 14, 2024).

[26] Tom Huddleston, Jr., *TikTok shares your data more than any other social media app — and it's unclear where it goes, study says*, https://www.cnbc.com/2022/02/08/tiktok-shares-your-data-more-than-any-other-social-media-app-study.html (last visited May 14, 2024).

[27] Sarah Perez, Snapchat announces 750M monthly active users, https://techcrunch.com/2023/02/16/snapchat-announces-750-million-monthly-active-users/ (last visited May 14, 2024).

[28] Matthew Johnston, How Snapchat Makes Money, https://www.investopedia.com/articles/investing/061915/how-snapchat-makes-money.asp (last visited May 14, 2024).

CLASS ACTION COMPLAINT

76.     Like Meta and TikTok, Snapchat sells its ability to create "custom audiences" and directly target consumers who are most apt to buy goods or services from the companies advertising on Snapchat's platform.[29]  One of the technologies Snapchat uses to effectively target ads is the Snap Pixel, "a tool that helps advertisers measure results, optimize audience targeting, and build audiences for their ad campaigns."[30]

77.     The Snap Pixel is a free piece of code that companies can install on their websites to track their customers' online activities.  The Snap Pixel "can track a variety of actions on [a] website, such as page views, add-to-cart actions, purchases, and sign-ups."[31]  This user data then allows companies to "create Pixel Custom Audiences to reach people who've already engaged with [the] business" or to "create Lookalike Audiences to reach people who are similar to [] current customers."[32]

78.     The Snap Pixel transmits the user's interactions with the website along with various identifiers and cookies that Snapchat then uses to link the user to a Snapchat account.[33]

### iii.  Google Tracking Code

79.     Google makes available to web developers a variety of tracking code, including Google Analytics and Google DoubleClick.

80.     The information that is intercepted and transmitted to Google via the Google tracking code includes: the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site.  In this way, Google tracking code tells Google exactly what a user's browser communicated to the website.

---

[29] https://forbusiness.snapchat.com/advertising/targeting

[30] https://forbusiness.snapchat.com/advertising/snap-pixel

[31] *Id.*

[32] *Id.*

[33] https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US

81.     Like with the other Tracking Tools, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.  Google then profits off the intercepted information by selling targeted advertising.

**E.      Done Aids and Abets the Third-Party Interception of Communications on its Website by Deploying the Tracking Tools**

82.     As an example of how the Tracking Tools operate on Done's Website, consider a visitor who opens Defendant's Website, and navigates to the "Diagnosis" webpage.  When doing so, the visitor's browser sends a GET Request to Defendant's server, requesting the server to load the webpage displayed below in ***Figure 1***:



*Figure 1: Depiction of Diagnosis Webpage*

83.     At the same time, the Meta Pixel causes the visitor's browser to secretly duplicate the visitor's communication with Done's Website, including the specific URL requested, and transmit the private communication to Meta along with unique identifiers used to link the communication to a specific Facebook user, as shown in ***Figure 2***:

CLASS ACTION COMPLAINT



*Figure 2: Depiction of information intercepted by Meta.*

84.     As reflected in ***Figure 2***, the "path" shows the specific URL for the page requested by the visitor's browser, including the substantive description "diagnosis."  It also shows the Pixel's transmission of the _fbp cookie, the c_user cookie (the Facebook ID), and other cookies and identifiers used to identify the website visitor by name and Facebook account.  Thus, the fact that a patient or prospective patient is using or considering using Done for healthcare services is transmitted to Meta. Disclosure of that information reveals to Meta the website visitor's status as a patient or prospective patient with Done.

85.     As another example, if that same patient inquired about ADHD medications through the Website's "Medications" webpage, the Pixel would likewise intercept those communications and transmit them to Meta along with the patient's unique identifiers, as reflected in ***Figure 3*** below:

*Figure 3: Depiction of search for "medication"*

CLASS ACTION COMPLAINT

86.     Done's deployment of the Google tracking code works in much the same way.  If a patient inquired about doctors who could prescribe ADHD medication, the patient's browser would send a GET request to Defendant's server to load the following webpage, as reflected in ***Figure 4***:



***Figure 4: Depiction of "Doctors" Webpage***

87.     Because Defendant's Website deploys the Google tracking code, the patient's private communications to Defendant's Website are also intercepted and transmitted to Google along with unique identifiers used to link the communications to a specific Google user, including the "NID" cookie used specifically for advertising,[34] as shown in ***Figure 5***:

---

[34] https://policies.google.com/technologies/cookies?hl=en-US ("The 'NID' cookie is used to show Google ads in Google services for signed-out users.").



*Figure 5: Depiction of "Doctor" Search Disclosed to Google*

88.     A patient's participation in the intake mental health assessment within Done's patient portal is likewise intercepted and disclosed via the Tracking Tools, as reflected by the below examples from the Meta Pixel and TikTok Pixel, in *Figure 6*:



1
2
3
4
5
6
7
8
9
10
11



*Figure 6: Mental Health Assessment on Done Patient Portal*

89.     Based on the above examples of how the Tracking Tools operates on Done's Website, the third-party technology companies would know (1) that a particular individual—who the technology companies could identify based on their respective accounts—was a patient or prospective patient of Done seeking mental health services; (2) that the named patient searched for information regarding diagnosis, medication, and doctors, all related to a specific condition—ADHD; and (3) that the named patient had taken the initial mental assessment within Done's patient portal. The third-party technology companies would also know the named patient's location and IP address, among other identifiers associated with the patient's computer or cell phone.

90.     Using this Personal Information, the technology companies could put the named patient into a Core or Custom Audience for purposes of targeted advertising by Done or any other company seeking to advertise its services or products to individuals that fit the named patient's profile.  Indeed, after using Done' Website to communicate about private mental health treatment for themselves, Plaintiff received ads from Done on Facebook.

91.     In this way, Done, Meta, TikTok, Snapchat, Google, and other third parties profit off Plaintiff's and Class Members' Personal Information without their knowledge, consent, or authorization.

92.     Defendant deprived Plaintiff and the Class Members of their privacy rights when it: (a) embedded and implemented the Tracking Tools, which surreptitiously intercepted, recorded, and disclosed Plaintiff's and other online patients' and prospective patients' confidential communications and private information; (b) disclosed patients' and prospective patients' protected information to unauthorized third parties; (c) linked particular patients—Plaintiff and the Class—with their healthcare provider—Done—including by revealing Plaintiff's navigation to and use of Done's patient portal; and (c) failed to provide notice to or obtain the consent from Plaintiff and the Class Members to share their Personal Information with others.

**F.     Exposure of Sensitive Information Creates a Substantial Risk of Harm**

93.     The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[35]

94.     The FTC also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require, among other things: (1) using industry tested and accepted methods; (2) monitoring activity on networks to uncover unapproved activity; (3) verifying that privacy and security features function properly; and (4) testing for common vulnerabilities or unauthorized disclosures.[36]

95.     The FTC cautions businesses that failure to protect Sensitive Information and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take

---

[35] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, at 2 (Dec. 7, 2009) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited May 14, 2024).

[36] *Start With Security, A Guide for Business,* FTC, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited May 14, 2024).

time, money, and patience to resolve the effect.[37] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

**G.    Plaintiff's and the Classes' Sensitive Information is Valuable**

96.    As many health care data industry experts have recognized, "[p]atients' medical data constitutes a cornerstone of the big data economy. A multi-billion dollar industry operates by collecting, merging, analyzing[,] and packaging patient data and selling it to the highest bidder."[38]

97.    Thus, the personal, health, and financial information of Plaintiff and the Class Members is valuable and has become a highly desirable commodity. Indeed, one of the world's most valuable resources is the exchange of personal data.[39]

98.    Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[40] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[41]

99.    The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success. Research shows that organizations who

[37] *See* Taking Charge: What to Do if Your Identity is Stolen, FTC, at 2 (2012), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf (last visited May 14, 2024).
[38] Niam Yaraghi, *Who should profit from the sale of patient data?,* The Brookings Institution (Nov. 19, 2018), https://www.brookings.edu/blog/techtank/2018/11/19/who-should-profit-from-the-sale-of-patient-data/ (last visited May 14, 2024).

[39] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited May 14, 2024).

[40] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated May 30, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html (last visited May 14, 2024).

[41] *Id.*

"leverage customer behavioral insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[42]

100.    In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[43] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[44]

101.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[45]

102.    Unlike financial information, such as credit card and bank account numbers, the PHI and certain PII cannot be easily changed. Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life. Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[46]

103.    Consumers place considerable value on their Personal Information and the privacy of that information. One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their Personal Information, between $11.33 and $16.58 per website. The

---

[42] Brad Brown, et al. *Capturing value from your customer data*, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data (last visited May 14, 2024).

[43] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220, OECD Publishing Paris (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf (last visited May 14, 2024).

[44] *Id.* at 25.

[45] *Id.*

[46] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters (July 21, 2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited May 14, 2024).

study further concluded that to U.S. consumers, the collective "protection against errors, improper access, and secondary use of personal information is worth between US$30.49 and $44.62.[47] This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

104.    Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[48]

105.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[49]

106.    Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information.  "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[50]

107.    There is also a market for data in which consumers can participate.  Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our

---

[47] Il-Horn Hann, Kai-Lung Hui *et al.*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17, Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited May 14, 2024).

[48] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, https://time.com/4588104/medical-data-industry/ (last visited May 14, 2024).

[49] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited May 14, 2024).

[50] VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited May 14, 2024).

increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

108. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

109. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

110. Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[51]

111. Defendant's privacy violations exposed a variety of Personal Information, including patient status, health conditions and symptoms, physicians, and other highly sensitive data.

112. PHI, like that exposed here, is likely even more valuable than Social Security numbers and just as capable of being misused.[52] PHI can be ten times more valuable than credit card information.[53] This is because one's personal health history, including prior illness, surgeries, diagnoses, mental health, prescriptions, and the like cannot be changed or replaced, unlike credit card information and even, under difficult circumstances, Social Security numbers.[54]

---

[51] *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited May 14, 2024).

[52] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI (April 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/#:~:text=(U)%20Cyber%20actors%20will%20likely,records%20in%20the%20black%20market. (last visited May 14, 2024).

[53] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers*, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 14, 2024).

[54] *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources. infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 14, 2024).

113.   Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[55] "Rapid digitization of health records . . . have positioned hospitals as a primary arbiter of how much sensitive data is shared."[56]

**H.   Plaintiff and the Class Had a Reasonable Expectation of Privacy in His Interactions with Defendant's Website**

114.   Consumers assume the data they provide to healthcare providers will be kept secure and private.

115.   The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[57] A March 2000 BusinessWeek/Harris Poll found that 89 percent of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[58] The same poll found that 63 percent of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[59] A July 2000 USA Weekend Poll showed that 65 percent of respondents thought that tracking computer use was an invasion of privacy.[60]

116.   Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of the iPhone operating software—which asks users for clear,

---

[55] Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records*, The Wall Street Journal (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200 (last visited May 14, 2024).

[56] *Id.*

[57] *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/. (last visited May 14, 2024).

[58] *Id.*

[59] *Id.*

[60] *Id.*

CLASS ACTION COMPLAINT

affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[61]

117.    Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive medical information they provided to Defendant through the Website to be kept secure and private.

## I.    Defendant's Conduct Violates HIPAA

118.    Under HIPAA, individuals' health information must be:

> properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The [Privacy] Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing.[62]

119.    HIPAA "is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."[63] The rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.[64]

120.    HIPAA defines "protected health information" as "individually identifiable health information" that is "created or received by a health care provider" (or similar entities) that "[r]elates to past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Identifiers such as patient-status (i.e., information that connects a

---

[61] Margaret Taylor, *How Apple screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook (last visited May 14, 2024).

[62] U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited May 14, 2024).

[63] *Health Insurance Portability and Accountability Act of 1996 (HIPAA)*, Centers for Disease Control and Prevention (June 27, 2022), https://www.cdc.gov/phlp/publications/topic/hipaa.html#:~:text=Health%20Insurance%20Portability%20and%20Accountability%20Act%20of%201996%20(HIPAA),-On%20This%20Page&text=The%20Health%20Insurance%20Portability%20and,the%20patient's%20consent%20or%20knowledge (last visited May 14, 2024).

[64] U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule.

particular user to a particular health care provider), medical conditions, health symptoms, treatments, and physicians, gathered in this case by the Tracking Tools through Done's Website, constitute protected health information.

121.    To ensure protection of this private and sensitive information, HIPAA mandates standards for handling PHI—the very data Defendant failed to protect. According to the U.S. Department of Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), HIPAA covered entities cannot share PHI or PII to online tracking technology vendors for marketing purposes without first obtaining the individual's HIPAA-compliant authorization.[65] The HHS Privacy Bulletin explicitly states:

> The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[66]

122.    The HHS Privacy Bulletin also identifies several harms that may result from an impermissible disclosure of an individual's PHI, including:

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[67]

---

[65] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES (March 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 14, 2024).

[66] *Id.* (internal citations omitted) (emphasis in original).

[67] *Id.* (internal citations omitted) (emphasis in original).

123.    According to HHS, "[s]ome regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps."  The "information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code."[68]

124.    Individually identifiable health information ("IIHI") "collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."[69] Thus, when a regulated entity, again like Defendant, collects the individual's information, that information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

125.    Further, the HHS Privacy Bulletin makes clear that the use of tracking technologies on the public-facing or "unauthenticated" portion of a hospital's website can likewise result in the unlawful disclosure of PHI.  According to the HHS Privacy Bulletin, "in some cases, tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors."[70] For example, "if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care."[71]

126.    When Plaintiff communicated with Done through its intake mental health assessment and communicated other personal health-related information on the Done Website, the Tracking Tools intercepted and disclosed those communications to third parties in violation of HIPAA's Privacy Rule, and Done never received Plaintiff's and Class Members' HIPAA-compliant consent to disclose those communications.

## **CLASS ACTION ALLEGATIONS**

127.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all others similar situated, as representatives of the following Classes:

Nationwide Class

All individuals residing in the United States whose Personal Information was disclosed to a third party through Defendant's Website during the applicable statute of limitations period.

California Class

All individuals residing in California whose Personal Information was disclosed to a third party through Defendant's Website during the applicable statute of limitations period.

128.    Excluded from the Classes is Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

129.    Plaintiff reserves the right to modify and/or amend the Class definitions, as necessary.

130.    All members of the proposed Classes are readily identifiable through Defendant's records.

131.    All requirements for class certification under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

---

[71] *Id.*

132.   **Numerosity**.  The members of the Classes are so numerous that joinder of all members of the Classes is impracticable. Plaintiff is informed and believes that the proposed Classes include tens of thousands of people based on public reports regarding Done's operations in numerous states across the country.[72] The precise number of the Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

133.   **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiff and the Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

   a.   Whether Plaintiff's and Class Members' private communications were intercepted by Meta, TikTok, and other third parties;

   b.   Whether Done aided, agreed with, employed or conspired with the third-party technology companies to intercept Plaintiff's and Class Members' communications with Done;

   c.   Whether the information disclosed through the Tracking Tools constitutes content;

   d.   Whether Done obtained Plaintiff's and Class Members' consent to intercept and disclose their private health information;

   e.   Whether Defendant's conduct was the proximate cause of Plaintiff's and the Classes' injuries;

   f.   Whether Plaintiff and the Class Members had a reasonable expectation of privacy in their Personal Information;

   g.   Whether Plaintiff and the Class Members suffered ascertainable and cognizable injuries as a result of Defendant's misconduct;

   h.   Whether Plaintiff and the Class Members are entitled to recover damages; and

   i.   Whether Plaintiff and the Class Members are entitled to other appropriate remedies including injunctive relief.

---

[72] *Done. Reaches Milestone in Opening 30 Physical Clinic Locations*, https://www.globenewswire.com/en/news-release/2023/12/04/2790094/0/en/Done-Reaches-Milestone-in-Opening-30-Physical-Clinic-Locations.html (last visited May 14, 2024).

134.   Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of themselves and the Classes. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

135.   **Typicality.**  Plaintiff's claims are typical of those of other Class Members because Plaintiff's Personal Information, like that of every other Class Member, was improperly disclosed by Defendant. Defendant's misconduct impacted all Class Members in a similar manner.

136.   **Adequacy.**  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and has retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes.

137.   **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual patients like Plaintiff would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

138.   Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate.  Defendant has acted or refused to act on grounds that apply generally to the Classes, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiff and the Classes remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with injuries similar to Plaintiff's, even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual patients, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual patients which would, as a practical matter, be dispositive of the interests of the other patients not parties to the

adjudications, or which would substantially impair or impede the ability to protect the interests of the Classes. Further, the claims of individual patients in the defined Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## LEGAL CLAIMS

### COUNT I

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code, §§ 630, *et seq.***

*(On Behalf of Plaintiff and the Nationwide Class)*

139.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

140.    The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."[73] Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state."[74]

141.    CIPA imposes liability on any person who "by means of any machine, instrument, contrivance, or in any other manner" (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [the State of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or

---

[73] CAL. PENAL CODE § 630.

[74] *Id.*

persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."[75]

142.    Defendant is a "person" for purposes of the CIPA.

143.    Defendant maintains its principal place of business in California, where it designed, contrived, agreed, conspired, effectuated, aided, and/or received the interception and use of the contents of Plaintiff's and Class Members' communications.

144.    Meta, TikTok, Snapchat, and Google violated CIPA by willfully and without the consent of all parties to the communication, or in any unauthorized manner, reading or attempting to read or learn the contents or meaning of any message, report, or communication while the same was in transit or passing over any wire, line, or cable, or was being sent from, or received at any place within the State of California.

145.    Defendant Done violated CIPA by aiding, employing, agreeing with, and conspiring with Meta, TikTok, Snapchat, Google and other third-party technology companies to track and intercept Plaintiff's and the Class Members' communications while using Defendant's Website.

146.    Defendant intentionally inserted an electronic device (the tracking technology code) that, without the knowledge and consent of Plaintiff and Class Members, recorded and transmitted their confidential communications with Defendant to third parties.

147.    The interception of Plaintiff's and Class Members' communications and Private Information was without authorization and consent from Plaintiff and Class Members.

148.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under CIPA, and even if they do not, the tracking technology code falls under the broad catch-all category of "any other manner":

    a.    The computer codes and programs Meta, TikTok, Snapchat, Google (and other third parties) used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    b.    Plaintiff's and Class Members' browsers;

---

[75] *Id.* § 631.

c.     Defendant's Website and webserver;

d.     Plaintiff's and Class Members' computing and mobile devices;

e.     The web and ad servers of the third-party technology companies that tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

f.     The computer codes and programs used by the third-party technology companies to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Website; and

g.     The plan Defendant and the third-party technology companies carried out to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit the Website.

149.    As a result of the above violations, Defendant is liable to Plaintiff and Class Members for the greater of: a) treble actual damages related to their loss of privacy in an amount to be determined at trial; or b) for statutory damages in the amount of $5,000 per violation.[76] Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."[77]

150.    Based on the foregoing, Plaintiff and Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## COUNT II

### Invasion of Privacy in Violation of Article I, Section 1 of the California Constitution

*(On Behalf of Plaintiff and the California Class)*

151.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

---

[76] CAL. PENAL CODE § 637.2.

[77] *Id.*

CLASS ACTION COMPLAINT

152.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."[78]

153.    The right to privacy in California's Constitution creates a private right of action against private and government entities.

154.    To state a claim for invasion of privacy under the California Constitution, a Plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

155.    Plaintiff and Class Members have and continue to have an objective, reasonable expectation of privacy in their Private Information pursuant to Article I, Section 1 of the California Constitution.

156.    Plaintiff's and Class Members' communications with Defendant constitute confidential communications.

157.    Plaintiff and Class Members have an objective, reasonable expectation of privacy in their communications with Defendant via the Website, particularly those containing sensitive medical information.

158.    Plaintiff and Class Members have an objective, reasonable expectation that Defendant would not disclose PII, PHI, and confidential communications to third parties without Plaintiff's or Class Members' authorization, consent, or knowledge.

159.    Plaintiff and Class Members have an objective, reasonable expectation of privacy given Defendant's representations, Notice of Privacy Practices, and HIPAA. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

---

[78] CAL. CONST. art. I, § 1.

160.    Without Plaintiff's or Class Members' knowledge, authorization, or consent, Defendant used the Tracking Tools embedded and concealed into the source code of its Website to secretly record and transmit Plaintiff's and Class Members' private communications to hidden third parties, such as Meta and other third-party tracking technology vendors.

161.    By intentionally embedding and implementing the Tracking Tools on its Website, Defendant invaded Plaintiff's and Class Members' legally protected privacy interests in the confidentiality of their communications with Defendant regarding sensitive medical information.

162.    By embedding and implementing the Tracking Tools on its Website, Defendant intentionally disclosed private facts about Plaintiff's and Class Members' symptoms, conditions, treatments, and status as patients or prospective patients to third-party tracking technology vendors.

163.    Defendant's actions constituted an egregious breach of social norms and serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the Private Information disclosed was highly sensitive and personal, as protected by the California Constitution; (ii) Defendant did not have authorization or consent to disclose this information and did so in contravention of its own representations to Plaintiff and Class Members; (iii) the invasion deprived Plaintiff and Class Members of the ability to control the circulation of said information, which is considered a fundamental right to privacy; (iv) Plaintiff and Class Members did not know they were being recorded and tracked; and (v) Defendant's disclosure violates HIPAA mandates, industry standards, and Defendant's own privacy policies.

164.    Defendant's invasion violated the privacy rights of thousands of Class Members, including Plaintiff, without authorization or consent. Its conduct constitutes a severe and egregious breach of social norms.

165.    Plaintiff and Class Members have sustained damages and will continue to suffer damages as a direct and proximate result of Defendant's conduct, including an invasion of privacy.

166.    As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiff's and the Class's Private Information, Plaintiff and Class Members suffered and continue to suffer harm and injury. Given the monetary value of individual personal information, Defendant deprived Plaintiff

and Class Members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class Members' property.

167.    Further, Defendant has improperly profited from its invasion of Plaintiff's and the Class Members' privacy in its use of their data for its economic value.

168.    Plaintiff and the Class Members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

## COUNT III

### Common Law Invasion of Privacy – Intrusion Upon Seclusion

*(On Behalf of Plaintiff and the California Class)*

169.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

170.    A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy, (2) in a manner highly offensive to a reasonable person.

171.    Plaintiff's and Class Members' communications with Defendant via Defendant's Website constitute private communications.

172.    Plaintiff and Class Members have an objective, reasonable expectation of privacy in their communications with Defendant via its Website, particularly those containing sensitive medical information.

173.    Plaintiff and Class Members have an objective, reasonable expectation that Defendant would not disclose PII, PHI, and confidential communications to third parties without Plaintiff's or Class Members' authorization, consent, or knowledge.

174.    Plaintiff and Class Members have a reasonable expectation of privacy given Defendant's representations, Notice of Privacy Practices, and HIPAA. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential.

175.    By intentionally embedding and implementing the Tracking Tools on its Website, Defendant intruded upon and permitted unauthorized third parties to intrude upon Plaintiff's and Class Members' private communications with Defendant regarding sensitive medical information.

176.    Plaintiff and Class Members did not consent to, authorize, or know about Defendant's intrusion of their privacy at the time it occurred. Plaintiff and Class Members never agreed that Defendant could use Tracking Tools to actively and surreptitiously record their Website sessions in real-time or disclose their Private Information to its vendors and other third parties.

177.    Defendant's use of the Tracking Tools to record and disclose Plaintiff's and Class Members' Private Information obtained via the Website is highly offensive to a reasonable person because Plaintiff and Class Members did not know they were being recorded and tracked, and the disclosures relate to patients' and prospective patients' most sensitive personal information, including information about specific symptoms, conditions, and treatments sought. The disclosure is also highly offensive because it violates HIPAA mandates, industry standards, and Defendant's own privacy policies.

178.    By implementing the Tracking Tools on its Website, Defendant intentionally intruded on Plaintiff's and Class Members' private life, seclusion, or solitude, without consent. This conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

179.    As a direct and proximate result of Defendant's intrusion upon Plaintiff's and Class Members' private communications and unauthorized disclosure of Plaintiff's and Class Members' Private Information, Plaintiff and Class Members suffered and continue to suffer harm and injury. Given the monetary value of individual personal information, Defendant deprived Plaintiff and Class Members of the economic value of their interactions with Defendant's Website, without providing proper consideration for Plaintiff's and Class Members' property.

180.    Further, Defendant has improperly profited from its invasion of Plaintiff's and Class Members' privacy in its use of their data for its economic value.

181.    Plaintiff and Class Members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

1

2

3

**COUNT IV**

**Breach of Confidence**

*(On behalf of Plaintiff and the California Class)*

4       182.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint

5   as if fully set forth herein.

6       183.    A claim for breach of confidence requires (1) the plaintiff conveyed confidential and

7   novel information to the defendant; (2) the defendant had knowledge that the information was being

8   disclosed in confidence; (3) there was an understanding between the defendant and the plaintiff that the

9   confidence be maintained; and (4) there was a disclosure or use in violation of the understanding.

10      184.    Plaintiff and the Class conveyed confidential and novel information to Defendant in the

11  form of personal mental health information concerning their symptoms and conditions related to ADHD.

12  The confidential information was conveyed in the form of substantive communications between Plaintiff

13  and the Class and Done's Website, including filling out Done's mental health assessment.

14      185.    Done had knowledge that the information was being disclosed in confidence.  According

15  to Done's own "Notice of HIPAA Privacy Practices," Done assured its patients and prospective patients:

16  "Without your authorization, we are expressly prohibited from using or disclosing your [private health

17  information] for marketing purposes."

18      186.    Given Done's assurances, regulatory guidance from the FTC and HHS regarding the use

19  of tracking tools on healthcare websites, and the sensitive nature of the information conveyed via Done's

20  Website—personal health information related to an individual's mental health—there was an

21  understanding between Done and Plaintiff and the Class Members that Done would take reasonable

22  steps to maintain the confidence and security of the communications.

23      187.    By installing the Tracking Tools on its Website that triggered the interception and

24  disclosure of Plaintiff's and Class Members' personal health information—which the third-party

25  technology companies could link to particular individuals—Done breached the confidence of Plaintiff

26  and the Class Members in violation of the understanding that their personal health information would

27  be reasonably safeguarded.

28

188.    Done's breach of confidence was in violation of HIPAA, regulatory guidance from the FTC and HHS, CIPA, and California common law.

189.    Defendant breached the confidence of Plaintiff and the Class Members for its own financial gain and to drive revenues through increased and more effective marketing and advertising, at the expense of Plaintiff's and the Class Members' privacy.

190.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have suffered harm and injury, including the breach of their confidence and loss of control of their sensitive personal health information to large advertising technology companies.

191.    Plaintiff and Class Members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

## COUNT V

### Violation of the California Unfair Competition Law

### Cal. Bus. & Prof. Code § 17200, *et seq.* – Unlawful Business Practices

*(On Behalf of Plaintiff and the California Class)*

192.    Plaintiff re-alleges and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

193.    The California Unfair Competition Law ("UCL") prohibits, inter alia, "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."[79]

194.    Plaintiff, Class Members, and Defendant are each a "person" under Cal. Bus. & Prof. Code § 17201.

195.    The acts, omissions, and conduct of Defendant as alleged herein constitute "business practices" within the meaning of the UCL.

196.    Plaintiff and Class Members bring their claims for injunctive relief as they have no confidence that Defendant has altered its privacy practices and they may wish to use Defendant's services in the future.

---

[79] CAL. BUS. & PROF. CODE §§ 17200, 17203–04, 17206.

44

CLASS ACTION COMPLAINT

197.    Plaintiff and Class Members bring their claims for restitution and injunctive relief in the alternative to their claims for damages.

198.    Defendant engaged in unlawful business practices by disclosing Plaintiff's and Class Members' Private Information to unauthorized third parties, including Meta, without prior consent in violation of the privacy laws alleged herein.

199.    Defendant's unlawful acts and practices include violations of Plaintiff's and Class Members' constitutional rights to privacy; Cal. Penal Code § 630, *et seq*.; and other violations of law alleged above.

200.    Plaintiff requests appropriate injunctive and declaratory relief against the continuation of the practices described and complained of herein. Such relief will create a public benefit. Plaintiff separately seeks public injunctive relief on behalf of the general public of California who have yet to deal with Defendant in the manner described herein, but are likely to in the future, and therefore, are in need of protection provided by the public injunctive relief sought. Such public injunctive relief will create additional public benefits.

201.    As a direct result of Defendant's violations of the UCL, Plaintiff and Class Members have suffered injury in fact and lost money or property including, but not limited to, loss of the benefit of the bargain in using Defendant's services. Specifically, Plaintiff and the Class Members used Defendant's Website for health services with the expectation that their Private Information would remain confidential. Had Plaintiff and Class Members known the truth that Defendant secretly disclosed their Private Information to third parties in violation of Defendant's own HIPAA Privacy Notice, they would have used the services of another healthcare provider or would have had the opportunity to seek consideration from Defendant for the use of their Private Information.

202.    The unauthorized access to Plaintiff's and Class Members' private and personal data also diminished the value of that information by making it available for free to Meta and other third parties for their use in marketing and advertising and generating profits.

203.    As a direct result of its unlawful practices, Defendant has been unjustly enriched and should be required to make restitution to Plaintiff and Class Members pursuant to §§ 17203 and 17204 of the California Business & Professions Code, disgorgement of all profits accruing to Defendant

45

because of its unlawful business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5) and injunctive or other equitable relief.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment in his favor as follows:

    a.    Certification of the Classes pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

    b.    Designation of Plaintiff as representative of the Classes and the undersigned counsel as Class Counsel;

    c.    An award of damages in an amount to be determined at trial or by this Court;

    d.    Declaring that Defendant's past conduct was unlawful, as alleged herein;

    e.    Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

    f.    Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

    g.    Awarding Plaintiff and the Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

    h.    Awarding Plaintiff and the Class Members pre-judgment and post-judgment interest;

    i.    Awarding Plaintiff and the Class Members reasonable attorneys' fees, costs, and expenses; and

    j.    Granting such other relief as the Court deems just and proper.

CLASS ACTION COMPLAINT

1

**DEMAND FOR JURY TRIAL**

2      Plaintiff, on behalf of himself and the Classes, demand a trial by jury of any and all issues in this

3  action so triable of right.

Respectfully submitted,

4

5                                                 **ZIMMERMAN REED LLP**

6  Dated: May 20, 2024                By:    /s/ Caleb Marker
                                              Caleb Marker
7                                             caleb.marker@zimmreed.com
                                              Flinn T. Milligan
8                                             flinn.milligan@zimmreed.com
                                              6420 Wilshire Blvd., Suite 1080
9                                             Los Angeles, CA 90048

10                                            Ryan J. Ellersick*
                                              14648 North Scottsdale Road, Suite 130
11                                            Scottsdale, AZ 85254
                                              Telephone: (480) 348-6400
12                                            ryan.ellersick@zimmreed.com

13                                            *Attorneys for Plaintiff and the Putative Classes*

14                                            *\*Pro Hac Vice application to be submitted*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT